JERMAINE BRASS, APPELLANT, *v.*
THE STATE OF NEVADA, RESPONDENT.

No. 56042

December 27, 2012                                    291 P.3d 145

[Rehearing denied February 28, 2013]

*Christopher R. Oram, Ltd.*, and *Christopher R. Oram*, Las Vegas, for Appellant.

*Catherine Cortez Masto*, Attorney General, Carson City; *Steven B. Wolfson*, District Attorney, *Steven S. Owens* and *David L. Stanton*, Chief Deputy District Attorneys, and *Nancy A. Becker*, Deputy District Attorney, Clark County, for Respondent.

Before DOUGLAS, GIBBONS and PARRAGUIRRE, JJ.

## OPINION

By the Court, DOUGLAS, J.:

In this appeal, we consider whether a district court committed reversible error by dismissing a prospective juror before conducting a hearing pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), and whether there was sufficient evidence to support a kidnapping conviction. We hold that when a defendant asserts a *Batson* violation, it is a structural error to dismiss the challenged juror prior to conducting the *Batson* hearing because it shows that the district court predetermined the challenge before actually hearing it. We further conclude that the insufficiency-of-evidence argument has no merit. Based on the structural error related to the alleged *Batson* violation, we reverse and remand.

### FACTS

The victim in this case, Ernest Mitchell, was married to appellant Jermaine Brass's sister, Katrinna. In January 2009, Ernest and

Katrinna returned home to discover that their front door had been kicked in; the only items that were missing from their home were tires and rims that Ernest had recently purchased. Katrinna testified that Ernest suspected that someone in her family was to blame because they were the only ones who knew about the tires and rims and where the couple lived. Katrinna and Ernest confronted some of Katrinna's brothers, but all denied their involvement.

An eyewitness would later testify that, on the day of the burglary, he had seen two men loading tires and rims into a compact, four-door car with the Nevada license plate 578VCB. Jermaine's girlfriend would testify that, at the time of the burglary, she owned a black Kia with the license plate 578VCB and that Jermaine had her permission to drive it.

The day following the burglary, one of Katrinna's brothers, Ronnie Brass, stopped by Ernest and Katrinna's home. Katrinna answered the door and told Ronnie to leave. However, Ernest arrived at the door and began to argue with Ronnie. The argument escalated and continued outside. Ronnie allegedly made a gesture with his hands, and an unidentified man appeared and started shooting at Ernest, who was hit a number of times before he fell. The shooter then walked over to Ernest and shot him in the head. Katrinna testified that Ronnie watched the shooter and then told him, "You're going to have to shoot that bitch Trinna or she's going to tell on us too." She also testified that the shooter then said to Ronnie, "Come on, Ronnie, let's go." The two men then ran away. The shooter's face was covered; however, Katrinna testified that the shooter's complexion was consistent with Jermaine's and that she was "sure it was [Jermaine's] voice."

During the investigation, the police interviewed Jermaine and he admitted that Ernest had confronted him about the rims but denied involvement with the burglary or the shooting. He also told the police that he did not know where Ernest and Katrinna lived; however, latent prints taken from the damaged front door matched Jermaine's left palm prints.[1]

The State charged Jermaine and Ronnie as codefendants with (1) burglary, (2) grand larceny, (3) conspiracy to commit kidnapping, (4) first-degree kidnapping, (5) conspiracy to commit murder, and (6) murder with the use of a deadly weapon.[2] Jermaine filed a motion to sever his trial from Ronnie's trial and to sever the burglary and grand larceny charges from the other charges. Jermaine's motion to sever was joined by Ronnie. The district court denied the motion.

---

[1]The record indicates that the prints must have been left prior to the shooting because Katrinna testified that the shooter never touched the front door.

[2]Ronnie's appeal is currently pending before this court, *Brass (Ronnie) v. State*, Docket No. 56146. However, on March 22, 2012, Ronnie died from a stab wound to the chest while serving his sentence in Ely State Prison.

During voir dire, defense counsel objected to the State's use of a peremptory challenge against prospective juror no. 173, noting that she was the second African American stricken from the venire. Defense counsel argued that the State had exercised its peremptory challenges based on race in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), and that prospective juror no. 173 was qualified to be a juror. The district court gave all prospective jurors a 15-minute break and indicated that it would hold the *Batson* hearing regarding prospective juror no. 173 during the break. However, prior to the break and the *Batson* hearing, the district court permanently excused a number of potential jurors, including prospective juror no. 173. The district court did this despite defense counsel's suggestion that the jurors be excused after the hearing on the *Batson* challenge. Subsequently, the district court conducted a *Batson* hearing and concluded that the State had race-neutral reasons for its peremptory challenges. Thus, it denied the defense's *Batson* challenge. The jury found Jermaine guilty on all six counts.

## DISCUSSION

On appeal, Jermaine argues that the district court erred in denying his *Batson* challenge and that there was insufficient evidence to support his kidnapping conviction.[3]

### *Jermaine's claim of discriminatory jury selection*

In reviewing the district court's resolution of a *Batson* challenge, we afford great deference to its determination of whether there has been discriminatory intent in the exercise of peremptory challenges. *Diomampo v. State*, 124 Nev. 414, 422-23, 185 P.3d 1031, 1036-37 (2008). Discriminatory jury selection in violation of *Batson* constitutes structural error, or error that affects the framework of a trial. *Id.* at 423, 185 P.3d at 1037; *Cortinas v. State*, 124 Nev. 1013, 1024, 195 P.3d 315, 322 (2008). Structural error necessitates automatic reversal because such error is "intrinsically harmful." *Cortinas*, 124 Nev. at 1024, 195 P.3d at 322.

---

[3]Jermaine also argues that NRS 200.450 is void for vagueness, the State offered invalid theories for his murder conviction, the district court made evidentiary errors requiring reversal, assistance of counsel at trial was ineffective, the district court gave incorrect jury instructions, the district court's denial of his motion to sever his trial violated his rights guaranteed by the Confrontation Clause of the United States Constitution, and cumulative error requires reversal. However, in light of our resolution in this appeal, these additional issues need not be reached.

The use of peremptory challenges in a racially discriminatory manner is a violation of the Equal Protection Clause. *Batson*, 476 U.S. at 89. We follow the three-step *Batson* analysis to determine whether there has been a violation. *Washington v. State*, 112 Nev. 1067, 1070, 922 P.2d 547, 549 (1996); *Doyle v. State*, 112 Nev. 879, 887, 921 P.2d 901, 907 (1996), *overruled on other grounds by Kaczmarek v. State*, 120 Nev. 314, 333, 91 P.3d 16, 29 (2004).

*Batson* requires the opponent to the peremptory challenge to first set forth a prima facie case of racial discrimination. *Purkett v. Elem*, 514 U.S. 765, 767 (1995). Once a prima facie case has been set forth, the burden of production shifts to the proponent of the strike to proffer a race-neutral explanation for the challenge. *Id.* This second step in the inquiry is concerned with only the facial validity of the explanation. *Id.* at 768. Finally, ''[i]f a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination.'' *Id.* at 767.

In the district court's consideration of a *Batson* challenge, ''implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.'' *Id.* at 768. The proponent of the strike '' 'must give a ''clear and reasonably specific'' explanation of his ''legitimate reasons'' for exercising the challenges.' '' *Id.* (quoting *Batson*, 476 U.S. at 98 n.20). The reason must be '' 'related to the particular case.' '' *Id.* at 768-69 (quoting *Batson*, 476 U.S. at 98). A legitimate reason is not a reason that ''makes sense'' but one that does not deny equal protection. *Id.* at 769.

Here, the district court dismissed prospective juror no. 173 prior to holding the hearing to determine whether the State had legitimate race-neutral reasons for its challenges.[4] The defendants

---

[4]While we resolve this appeal on other grounds, we note our concern with the possibility that the dismissal of a prospective juror before holding a *Batson* hearing may present the appearance of improper judicial bias. *See* NCJC 2.3(B) (''A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, . . . based upon race . . . .''); *cf. Cameron v. State*, 114 Nev. 1281, 1283, 968 P.2d 1169, 1171 (1998) (''Remarks of a judge made in the context of a court proceeding are not considered indicative of improper bias or prejudice unless they show that the judge has closed his or her mind to the presentation of all the evidence.'').

were not afforded an adequate opportunity to respond to the State's proffer of race-neutral reasons or to show pretext because the district court permanently excused prospective juror no. 173 before holding a *Batson* hearing. Dismissing this prospective juror prior to holding the *Batson* hearing had the same effect as a racially discriminatory peremptory challenge because even if the defendants were able to prove purposeful discrimination, they would be left with limited recourse.[5] This discriminatory jury selection constitutes structural error that was intrinsically harmful to the framework of the trial. Therefore, reversal is warranted. *See Cortinas*, 124 Nev. at 1024, 195 P.3d at 322.

*Jermaine's claim of insufficient evidence to support his kidnapping conviction*

Jermaine argues that the State did not present sufficient evidence to convict him of kidnapping.[6] The Due Process Clause of the United States Constitution requires each element that constitutes a crime be proven beyond a reasonable doubt. *Rose v. State*, 123 Nev. 194, 202, 163 P.3d 408, 414 (2007). When reviewing a criminal conviction for sufficiency of the evidence, this court determines whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt when viewing the evidence in the light most favorable to the prosecution. *Id.* The jury's verdict will not be disturbed on appeal when there is substantial evidence supporting it. *LaPierre v. State*, 108 Nev. 528, 530, 836 P.2d 56, 57 (1992).

Under NRS 200.310(1), a person is guilty of first-degree kidnapping if that person willfully "inveigles, [or] entices . . . a person by any means whatsoever . . . for the purpose of killing the person or inflicting substantial bodily harm upon the per-

---

[5]We note that, if the district court held the *Batson* hearing *prior* to excusing prospective juror no. 173 and it found purposeful discrimination, recourse would be needed. Possible remedies could include allowing her to remain in the jury pool, discharging the entire venire and selecting a new jury, or calling additional jurors to the venire and granting additional peremptory challenges. *See, e.g., Batson*, 476 U.S. at 99-100 n.24; *Caston v. Costello*, 74 F. Supp. 2d 262, 271 (E.D.N.Y. 1999).

[6]Jermaine also makes the claim that there was insufficient evidence to support his conspiracy-to-commit-kidnapping conviction; however, he only offers arguments in support of his claim of insufficient evidence to support his kidnapping conviction. We review Jermaine's sufficiency-of-evidence argument despite our resolution of this appeal on other grounds because "[t]he Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." *Burks v. United States*, 437 U.S. 1, 11 (1978).

son . . . ." Here, the record reflects that Ronnie arrived at the home of Ernest and Katrinna and an argument ensued between Ronnie and Ernest. The argument escalated and Ernest eventually walked out the front door of his house. Thereafter, Ronnie allegedly signaled to an unidentified man who shot Ernest. Evidence was presented that this unidentified man was Jermaine. This evidence viewed in the light most favorable to the State suggests that there was a specific plan to lure Ernest outside of the house for Jermaine to have a clear shot at him. Therefore, a rational jury could find that Jermaine had willfully enticed Ernest to leave his house for the purpose of killing him. Jermaine's insufficiency-of-evidence argument has no merit.

Based on the structural error related to the *Batson* challenge, we reverse the judgment of the district court and remand this matter to the district court for proceedings consistent with this opinion.

GIBBONS, J., concurring:

I agree with the majority that it is structural error to excuse a juror before the *Batson* objection and response is considered by the trial court. As the majority concludes, the proponent of a *Batson* strike must set forth legitimate reasons for exercising the challenge. One of the reasons set forth by the proponent for striking an African-American juror was that she is a registered Democrat who had "Democratic" views on law enforcement. Political affiliation is not a proper component as a basis for asserting a challenge to a juror.

PARRAGUIRRE, J., concurring:

I concur in the result only.